Thomas Ward Cullen v. Commissioner.
Cullen v. Commissioner
Docket No. 794.
United States Tax Court
1944 Tax Ct. Memo LEXIS 183; 3 T.C.M. (CCH) 686; T.C.M. (RIA) 44229; July 15, 1944
*183 Edward K. Hanlon, Esq., for the petitioner. Walt Mandry, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings involve income taxes for the calendar years 1938, 1939, and 1940. The petition herein was filed for the purpose of redetermining the following deficiencies: $1,702.40 (1938), $1,799.56 (1939), and $21,726.69 (1940). The Commissioner in his deficiency notice adjusted petitioner's net income for 1938 by adding thereto the sum of $7,296.25 as "ordinary income" and the sum of $2,083.60 as "shortterm capital gain"; for 1939, by adding the sum of $8,361.90 as "income from fiduciaries"; and for 1940, by adding the sum of $5,055.90 as "ordinary income" and the sum of $60,926.14 as "long-term capital gain." The only issue is whether the income of cerain trusts is taxable to petitioner, their creator and sole trustee, under section 22 (a), or section 167 of the Revenue Act of 1938 and of the Internal Revenue Code, or as amended by section 134 of the Revenue Act of 1943. From evidence adduced, we make the following: Findings of Fact Petitioner is an individual, residing in Garden City, New York. His income tax returns for the *184 periods here involved were filed with the collector of internal revenue for the second district of New York. During the taxable years in question, and for twenty-five years prior thereto, petitioner was associated with an investment company, and actively traded in securities both on margin and outright transactions. In 1931, he gave his wife, Marian Irene Cullen, 3705 shares of the common stock of Beneficial Industrial Loan Corporation (hereinafter sometimes referred to as Beneficial). At the time of that gift, Beneficial common stock had a fair market value of $10 per share. Petitioner's wife has since that time owned and controlled these 3705 shares of Beneficial common stock or the proceeds from the sale thereof. On December 20, 1934, petitioner purchased 9800 shares of the "Class B" shares of the capital stock of Empire Capital Corporation (hereinafter sometimes referred to as Empire) from Clarence Hodson & Company, Inc. (hereinafter sometimes referred to as Hodson) at $5.31 1/4 per share. At the same time, and with her separate funds, petitioner's wife purchased 10,200 shares of Empire "B" stock at the same price. The 20,000 shares so purchased by petitioner and his wife represented *185 the total authorized "Class B" stock of Empire, which also had authorized and outstanding 155,842 "Class A" capital stock. The ownership of the "Class A" stock was widely diversified. The holders of the "Class B" stock were entitled to elect two-thirds of Empire's Board of Directors," and the holders of the "Class A" stock were entitled to elect the remaining one-third. The "Class A" stock was entitled to an 8 per cent dividend first after which the "Class B" stock was entitled to an 8 per cent dividend; thereafter, both classes of stock shared equally in any further dividends and had the same rights upon liquidation. "Class A" stock was not listed in the New York Stock Exchange; its average selling price from 1936 to 1940 was slightly under six dollars and the price ranged during that period from 5 1/4 to 6 1/8. Petitioner voted his own shares of "Class B" stock, also those of his wife by proxy, thus controlling the election of two-thirds of Empire's board of directors. Petitioner was president and a member of the board of directors of Empire from January 1936 until some time in December 1940, and was actively connected with the affairs of that corporation during that period. Empire *186 was a holding company whose subsidiaries were in the personal finance and small loan business. As of December 1934, Empire had two or three subsidiaries. On August 13, 1935, by a single instrument, petitioner created five equal trusts for each of his five children, Thomas Ward Cullen, Jr., Eugene Edmund, Cullen, William Francis Cullen, Marian Irene Cullen, and Rosemary Barbara Cullen, then aged, 7, 6, 4, 3 and 2 years, respectively. He delivered to himself, as trustee in connection with the creation of these trusts, 15 shares of the common stock of Hodson, having a fair market value at that time of $3,000 per share. Five separate certificates of these shares, each in the name of petitioner as trustee for each of the children named in the trust indenture, and each for three shares, were issued in lieu of the single certificate for 15 shares of capital stock of Hodson standing in the name of petitioner individually. Petitioner filed a gift tax return (Forms 709 and 710) for each of the five trusts so created. On August 13, 1935, petitioner's net worth was between $150,000 and $200,000. On that date there was a likelihood that petitioner's income would diminish. His income, including *187 wages, interest and dividends, but not including capital gains and losses, was $15,000 in 1932, $21,000 in 1933, $58,000 in 1934, and $48,000 in 1935. The deed of trust of August 13, 1935, is made a part of our findings. In material part it provides: for the transfer to the petitioner and to any future co-trustees, 15 shares of Hodson stock, in trust for the following purposes: To divide same into five equal trust shares, one for each of petitioner's five children; to invest and reinvest principal and collect income and pay expenses; to pay each child the accumulated income at the age of 21, and to pay to him the principal of his share, one-third at the age of 21 years, one-third at the age of 25 years, and the balance at the age of 30 years, at which time the trust for such child shall terminate; to pay any principal or income remaining after the death of any child prior to the age of 30, to his issue in equal shares and in default of such issue, to his brothers and sisters, then living, in equal shares. The trustor reserved for himself, his co-trustees and successors the authority to retain the securities placed in trust or to dispose thereof and to invest the proceeds in obligations *188 of the United States or any state or territory, foreign government, corporation, domestic or foreign, or any bonds secured by real estate, or to make any other investments permitted to trustees by the law of New York; to sell to the trust estate at fair value any securities in which the trustee might invest, and to purchase from the trust estate at fair value any such securities, to enter agreements for reorganization, consolidation or merger of any corporation of which the grantor should hold the stock, bonds or obligations; to hold the securities in the name of the trustee or trustees within their discretion; to appoint co-trustees; to delegate, in case there is more than one trustee, the powers conferred, upon other trustees; (and as to the grantor himself, to delegate to any person or corporation) and to act without giving bond and without liability for errors, neglect or mistake or act of omission or commission while acting in good faith. The deed of trust further provided that it should be irrevocable, that in the event of trustor's death prior to the termination of the trusts, his wife should serve in his place with all of his powers. It was also provided that in the event *189 that the trustor was, during the minority of a child for whom a share was set apart, unable to support and educate such child, because of financial inability, the trustee or trustees might apply the net income or such part thereof as might be deemed suitable from time to time, to the maintenance, support and education of the child and to accumulate the balance of the income for payment to him at age of 21 years; and might in case of the trustor's financial inability to support and educate such child pay over and apply to the use of such child any portion of the principal of the trust set aside for him, in case of insufficiency of income to supply the needs of such child. On December 30, 1938, petitioner created another trust for the benefit of his son, Robert Emmet Cullen, who was born after the first group of trusts was created. This trust indenture is identical in all respects to the one set forth above except that the petitioner delivered to himself as trustee 250 shares of Beneficial, which he valued at $4,937.50 in the gift tax return which he filed in connection with the creation of this trust. Petitioner was never connected with Beneficial as an officer or director or in any *190 way. Three certificates, two for 100 shares and one for 50 shares, were issued in petitioner's name as trustee for Robert Emmet Cullen, together with one certificate for 50 shares in petitioner's name individually, in lieu of three certificates, each for 100 shares formerly standing in petitioner's name individually. Another trust was created by petitioner in December 1940 for the benefit of his daughter Elleen Virginia Cullen, who was born after December 30, 1938, when the trust for the benefit of Robert Emmet Cullen was established. No additional gifts were ever made either by petitioner or anyone else to the corpora of the trust created on August 13, 1935. Petitioner made a gift on December 14, 1939, to the Robert Emmet Cullen trust created on December 30, 1938, of 150 shares of Beneficial common, which he valued at $3,150 in the gift tax return which he filed in connection with the making of this gift. His wife made a gift of $17,000 in cash to this same trust on December 29, 1941. She also made a gift of $23,000 at the same time to the Eilleen Virginia Cullen Trust, created in December 1940, and filed a gift tax return in connection with both gifts. Petitioner maintained *191 equality among the five trusts created by the trust deed dated August 13, 1935. The purpose of the additional gifts to the Robert Emmet Cullen Trust and to the Eileen Virginia Cullen Trust was to build up these latter trusts so that they would be on a par with the trusts created on August 13, 1935. Petitioner maintains separate bank accounts for each of the seven trusts he created. On December 10, 1935, petitioner as trustee under the indenture dated August 13, 1935, sold the 15 shares of Hodson at $3,350.73 1/3 per share, receiving therefor a total of $50,261. From part of these proceeds, petitioner, as trustee and for the benefit of these same trusts purchased from himself, on January 22, 1936, 3,000 shares, and on January 30, 1936, purchased 2,500 shares of "Class B" Empire stock at $5.31 1/4 per share, at a total cost of $29,218.75. This was the same price he had paid for them when he purchased them for his individual account on December 20, 1934. "Class B" Empire stock improved in value a little between December 20, 1934, and January 1936. The 5,500 shares of Empire "Class B" stock were sold on December 11, 1940, at $26.25 per share. The entire proceeds from the sale of the *192 5,500 shares of stock were retained by the trusts. The sale of the 5,500 shares was made by petitioner as trustee pursuant to a contract dated November 12, 1940, whereby petitioner on behalf of himself, individually and as trustee, and on behalf of his wife, agreed to sell to Capital Finance Corporation all of the outstanding "Class B" common shares of the capital stock of Empire, to wit, 20,000 shares for $525,000. Petitioner conducted all the negotiations of this sale and in the contract represented that he had full authority to sell all of the 5,500 shares. Petitioner received seven checks, one for each of the five trusts payable to himself as trustee, one payable to his wife, and one payable to himself individually. The volume of Empire's business increased from $1,366,000 in 1935 to $2,117,000 in 1936, to $2,492,000 in 1938, and to $3,094,000 in 1940. The number of Empire's subsidiaries had increased from two or three to seven. At the time of this sale of the 20,000 shares of "Class B" stock, loan companies were anxious to get business. All these factors, plus the fact that petitioner was in a position to sell control of the "Class B" stock, account for the price of 26 1/4 at *193 which the stock was sold. Since the sale of the "Class B" Empire stock, petitioner has never purchased for any of the trusts created December 13, 1935, or for the Robert Emmet Cullen Trust, any stock in a corporation in which he had a controlling interest; nor has he purchased, as trustee, any stock in order to achieve control of any corporation. Trust funds after December 11, 1940, were invested generally in common and preferred stocks listed on the New York Stock Exchange or the New York Curb Exchange. Petitioner has never borrowed any money from the trusts for his individual benefit; nor has he, as trustee, ever used any income from the trusts for any purpose other than investment; and petitioner has never used any part of the trust income or principal at any time for the support, maintenance or education of any of the respective beneficiaries. The income from the trusts has been accumulated and invested subject only to the payment of the expenses of the trust. He has always had sufficient income to support, maintain, and educate his children without taking any money from the trusts. His net income for 1938 was $20,557.91; for 1939, $25,808; and for 1940, $68,941.59. At the trial *194 of this case, petitioner, individually and as trustee for the various beneficiaries of the trusts involved in these proceedings, submitted a letter which was received in evidence as petitioner's Exhibit 1, the text of which is as follows: "Referring to Section 134 (b) (2) of the Revenue Act of 1943, and to the case now pending before The Tax Court of the United States, entitled "Thomas Ward Cullen v. Commissioner of Internal Revenue", docket number 794, I hereby agree and consent that, if upon final determination of said case, I shall be held not taxable upon the income from the trusts there involved, there shall be paid, at such time as you may prescribe, all of the taxes under Chapter 1 of the Internal Revenue Code or under the corresponding provisions of prior revenue laws which would have been paid for the taxable years concerned if the amendments made by subsection (a) of Section 134 of the Revenue Act of 1943 had been a part of the revenue laws applicable to such taxable years, and that any and all claims for refund filed by me as Trustee of said trusts may be disposed of accordingly." Opinion The first question is whether the income from these trusts for the taxable *195 years here involved is taxable to petitioner under section 167 of the Revenue Act of 1938 and of the Internal Revenue Code. The provisions of section 167 of the Revenue Act of 1938 were the same as those of section 167, I.R.C., prior to the amendment made by section 134 of the Revenue Act of 1943. Section 167 is set forth in the margin in its unamended form. [1]
*196 It is the contention of the respondent that section 167 of the Internal Revenue Code is applicable because of the trust provisions as to support and education of petitioner's children with trust funds. It is not contended that trust funds were actually used for such support and education. During the taxable years the trust beneficiaries were all minor children. The trust provisions are, in short, that in case of the financial inability of the petitioner to support and educate any child-beneficiary during minority, trust income may, if deemed suitable by the trustees, be applied for the maintenance, support and education of such child, in case of insufficiency of income to supply his needs. In the recent case of Robert P. Scherer, 3 T.C. 776, this Court held that, under the facts there present, the doctrine of Helvering v. Stuart, 317 U.S. 154, was not applicable where the clause in the trust instrument read as follows: To pay from time to time to the beneficiary from the income of the trust such sums as the Trustee may deem advisable for the beneficiary's personal use and enjoyment, and where the use of trust funds *197 may be necessary because of my then present inability to so properly provide, to pay either from corpus or income so much as may be necessary for the support, maintenance and education of said beneficiary. [Underscoring supplied.] It is apparent that the provision of the trust instrument in the Scherer case are identical for all practical purposes with those in the instant case. This Court in the Scherer case in commenting on the provisions of the trust instrument therein involved made the following statements: * * * It will be noted that in the language above quoted from the trust instruments the trustee is not given the broad power as existed in the Stuart case "to apply so much of said income for his education, support, and maintenance, as to them shall seem advisable." In the instant case the trustee is empowered to use the income of the trusts for the support, maintenance, and education of the minor beneficiaries only in situations where the settlor, Scherer, is unable to so properly provide. The testimony in the instant case was to the effect that at all times pertinent hereto Scherer was amply able to provide for the support, education, and maintenance *198 of his minor children and that none of the income of the trusts has ever been used by the trustee for such purposes. This being the state of the proof, we think Helvering v. Stuart, supra, is not applicable. Cf. Commissioner v. Katz, 139 Fed. (2d) 107 [43-2 USTC [*] 9640]. The state of the proof in the case at bar is the same, in all material respects, as that described in the language quoted above. We are, therefore, of the opinion, following the Scherer case, that the income of the trusts involved in the instant case, is not taxable to the petitioner under section 167 of the Revenue Act of 1938 and of the Internal Revenue Code. This conclusion makes it unnecessary to consider the effect of the amendment made to section 167, I.R.C. by section 134 of the Revenue Act of 1943. [2]
*199 We consider next the question whether the income from these trusts for the taxable years here involved is taxable to petitioner under section 22 (a) of the Revenue Act of 1938 and of the Internal Revenue Code. The changes which have been made in section 22 (a) of the Revenue Act of 1938 and of the Internal Revenue Code are not material to the issues presented in the instant case, and, therefore, section 22 (a) of the Revenue Act of 1938 in its original form is set forth in the margin below. [3]
Helvering v. Clifford, 309 U.S. 331, at page 335, *200 tells us, on this subject, that "* * * the answer to that question must depend on an analysis of the terms of the trust and all the circumstances attendant on its creation and operation" and we recently pointed out that such an analysis "requires a nice balancing of the powers and rights granted to the trustee and beneficiary and those retained by the donor, to the end of determining where lies the real right of ownership of the income. [n4] The trust instrument contains factors which tend to establish the petitioner as the owner of the income from these trusts. Petitioner was the sole trustee and as such he had the right to invest and reinvest the principal of the trust; to accumulate the income or to apply the income or the principal of the trust for the maintenance, support and education of the beneficiaries in the event that he was unable to support and educate them because of financial inability; to retain the securities which constituted the original trust res or to sell them and to invest the proceeds from such sale in bonds or other obligations of the United States, any state, or foreign government, or subdivision or municipality, and in the stocks and bonds or other obligations *201 of corporations organized under the laws of the United States, or any state and territory, and in real estate bonds and mortgages on property situated in the United States. Petitioner reserved the right to donate additional securities or assets to the trust and to sell to and buy from the trusts securities at their fair market value. As trustee, petitioner had the further right to make and enter into all agreements for reorganization or merger of any corporation of which he held shares of stock. Petitioner was not required to give security for the performance of his duties as trustee and was not to be held liable for any error in judgment, oversight, mistake, neglect or for any misinterpretation of his powers, duties or rights while endeavoring in good faith to carry out the terms of the trusts. Petitioner reserved the right to appoint one or more persons or bank or trust company to act with him as trustee and to delegate all the powers reserved to him under the trust to any individual or corporation and the right to revoke such appointment or delegation. On the other hand the following facts tend to negative ownership on the part of the petitioner: The trusts are irrevocable. The *202 net income is to be accumulated during the minority of each child (except for the clause relating to maintenance) and, as and when each child reaches the age of twenty-one and until the child shall have reached the age of thirty, the income from that child's share is to be paid to the child in quarterly or semi-annual installments. Accumulations of income and one-third of the principal are to be paid to each child as that child reaches the age of 21; one-third more of the principal is to be paid when the child is 25 years old; and the balance of the principal is to be paid when the child is 30 years old, at which time the trust is to terminate. If any child dies before reaching the age of 30, that child's share is to be paid over and distributed to the issue of such child in equal shares per stirpes, and if there be no issue of such child, to the brothers and sisters of such child, as may then be living, in equal shares. In the trust instruments, petitioner made no provision for a reversion of the trust assets to himself or to his estate, and did not reserve the right to alter or amend the terms of the trust. The circumstances surrounding the creation of the trusts and their *203 operation (except as to the dealings in "Class B" Empire stock, which will be discussed later) in our opinion support petitioner's contention that he ceased to be the owner of the corpus and income of these trusts after they were created. The five trusts created on August 13, 1935, together with the additional trusts created for later born children, indicate a uniform plan on petitioner's part to provide for the future security of his children. The attempt to maintain equality of the corpus of each trust, the maintenance of separate bank accounts for each trust in the name of petitioner as trustee for each beneficiary, the failure on the part of the petitioner to use any of the accumulated income or principal either for his own benefit individually, or for the support, maintenance or education of any of the various beneficiaries, the carrying of investments in the name of petitioner as trustee, and, except for the temporary investment in "Class B" Empire stock, the investment of the undistributed income and principal of these trusts in diversified securities of corporations in which petitioner had no interest, all negative petitioner's individual ownership of the corpus and income *204 of these trusts. It, therefore, appears that the only factor tending to establish the petitioner herein as the owner of the income of these trusts is the broad powers of management which he had under the trust instrument as trustee. TheisCourt has held that "The power to manage trust property, however unlimited, may not operate to bring the grantor within the provisions of section 22 (a) if by such power he can not derive any economic benefit therefrom except whatever advantages he may gain by virtue of the statutory provisions which permit the creation of trusts or estates." W. C. Cartinhour, 3 T.C. 482 at page 489, and cases cited therein. See also, Herbert Abraham and Dorothy Abraham, 3 T.C. 991. In the instant case, petitioner has made an irrevocable gift of his property under conditions which preclude his utilizing the income or corpus of the trust he has created for his individual benefit. Even the right he has reserved to apply the income or principal from the trust to the support of his children during their minority in the event of his financial inability to support them is but an echoing of the duty imposed *205 upon him by section 17 of the Personal Property Law of the State of New York. [6] See Guterman, "The Stuart Case and Its Aftermath," 57 H.L.R. 479 at pages 487 and 488. Nor does it seem to us to be unnatural for a grantor who has had twenty-five years of practical experience in the buying and selling of stocks and bonds to invest himself as trustee with broad discretionary powers as to the type of investment permissible to be made with trust funds. There is ample additional authority in support of petitioner's position; we cite only Meyer Katz v. Commissioner, 46 B.T.A. 187, affd. 139 Fed. (2d) 107, Commissioner v. Branch, 114 Fed. (2d) 985, affirming 40 B.T.A. 1044. *206 We are, therefore, of the opinion that the instant case is distinguishable from the Clifford case. We said in the case of Lura H. Morgan, 2 T.C. 510, at page 514, that all the grantor had done in the Clifford case was "to assign irrevocably income from certain property for a term." Whiteley v. Commissioner, 120 Fed. (2d) 782, cited by the respondent is likewise distinguishable on the grounds discussed under the first issue, supra. We also distinguish Louis Stockstrom, 3 T.C. 255, for in that case the immediate payment of any income to any beneficiary was in the sole discretion of the settlor-trustee. Two of the vital factors which were held to be controlling in the recent case of Lorenz Iversen, 3 T.C. 756 namely, the power of the trustee to control the distribution of trust income to the beneficiaries, and the power to terminate the trusts at will, are lacking in the case at bar, and, therefore, we do not consider the decision in that case to be determinative of the issue herein involved. It is urged also that the instant case should result *207 in the petitioner's being taxed individually as to the income received by him as trustee during the taxable years in question because during such years the corpus of each of the five trusts consisted inter alia of 1,100 shares of "Class B" Empire stock (which were sold in January 1936 to the trusts by petitioner at $5.31 1/4 per share, the same price at which petitioner had purchased the stock in December 1934). Respondent points out that petitioner and his wife had purchased all of Empire's "Class B" stock in 1934 (20,000 shares) and that this class of stock elected two-thirds of the members of the board of directors and consequently controlled the corporation; further that petitioner was president and a member of the board of directors of Empire and actively engaged in the business of the corporation; and petitioner voted all the shares of "Class B" stock, voting the 10,200 shares of his wife by proxy. The facts do not, in our view, justify a conclusion that because of petitioner's connection with Empire and its stock he should be taxed on the income of that which he placed in trust. The "Class B" Empire stock constituted only approximately 50 per cent of the corpus of each *208 trust. That it was only a temporary investment (and a wise one, as it turned out) is best demonstrated by the fact that they were sold at 26 1/4 per share on December 11, 1940, pursuant to a written agreement dated November 12, 1940. These shares were not part of the original corpus of any of these trusts and no other stocks or bonds of a corporation in which petitioner was a stockholder, or in the management of the affairs of which petitioner was active, have ever been a part of the corpus of any of these trusts. Furthermore, all five trusts together never owned a total of more than 5,500 shares of "Class B" Empire stock, whereas petitioner's wife, at all times during the taxable years in question, was the individual owner of 10,200 shares which is more than half of the total outstanding and authorized "Class B" stock. The stock in the trusts was not essential to the maintenance of a stock control of Empire by either petitioner alone or by petitioner and his wife. The stock in the trusts plus petitioner's individual holdings would not give him control of Empire. His wife, or he with her, had control without it. This point is covered by our opinion in the case of John Stuart, 2 T.C. 1103; *209 see especially pages 1111 and 1112 of that opinion. The case of Murphy Shannon Armstrong, 1 T.C. 1008, cited by the respondent, is distinguishable from the instant case because in the Armstrong case the trust's interest combined with that of grantor-trustee's gave the latter majority control of the family business which was the subject matter of the trust. Though in Frederick B. Rentschler, 1 T.C. 814, we upheld taxation of trust income to the trustor, under circumstances including the fact that stock placed in trust was in a company in which the trustor was chairman of the board of directors, the point there was a minor one, the opinion plainly being based. largely upon other considerations. We note particularly that therein the powers reserved by the trustor were much broader than here, and that the trustor could borrow from the trust, and divert the corpus to the satisfaction of his personal obligations. No such powers were reserved in the instant case. Moreover, there the majority of the stock was owned by a very large number of holders of small amounts of stock; whereas here definite control, more than 50 *210 per cent of the "Class B" stock here involved (which in effect controlled the corporation by electing two-thirds of the directorship) was, as above seen, in the petitioner's wife. It is not suggested by respondent in the instant case that petitioner was the real owner of his wife's shares of "Class B" Empire stock. Though we do not lay down any general rule that more than 50 per cent of corporate stock is necessarily requisite to such control as to effect the present question, we do find in the facts herein a negation of the view that the petitioner retained such control of the Empire stock as should be held to cause him to be taxable herein on the trust income. An approximation of the elements of full ownership is not here approached. Frank G. Hoover, 42 B.T.A. 786 is also cited by the respondent. Therein, the recitation that the trustor was actively interested in a corporation, the stock of which was included in trust corpus, was one of the reasons for holding the trustor taxable upon trust income, but upon examination of the facts in that case, which do not disclose the amount of the trustor's stock interest in the corporation or otherwise define *211 his connection with the corporation, we are unable to find support for the respondent's views here. Being of the opinion that petitioner is not taxable on the income in question under section 22 (a) either because of the broad powers of management conferred upon him as trustee by the trust instrument, or because of the transactions in "Class B" Empire stock, whether these factors are considered separately or together, and on all the evidence, we conclude that petitioner is not taxable on the income from these trusts during the taxable years herein involved under either section 22 (a) or section 167 of the Revenue Act of 1938 and of the Internal Revenue Code. Decision will be entered for the petitioner. Footnotes
1. SEC. 167. INCOME FOR BENEFIT OF GRANTOR. (a) Where any part of the income of a trust - (1) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income may be, held or accumulated for future distribution to the grantor; or (2) may, in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income, be distributed to the grantor; or (3) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income, may be applied to the payment of premiums upon policies of insurance on the life of the grantor (except policies of insurance irrevocably payable for the purposes and in the manner specified in section 23 (o), relating to the so-called "charitable contribution" deduction); then such part of the income of the trust shall be included in computing the net income of the grantor. (b) As used in this section, the term "in the discretion of the grantor" means "in the discretion of the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of the part of the income in question."↩
2. SEC. 134. TRUSTS FOR MAINTENANCE OR SUPPORT OF CERTAIN BENEFICIARIES. (a) Income for Benefit of Grantor. - Section 167 (relating to income for benefit of grantor) is amended by adding at the end thereof the following subsection: "(c) Income of a trust shall not be considered taxable to the grantor under subsection (a) or any other provision of this chapter merely because such income, in the discretion of another person. the trustee, or the grantor acting as trustee or cotrustee, may be applied or distributed for the support or maintenance of a beneficiary whom the grantor is legally obligated to support or maintain, except to the extent that such income is so applied or distributed. * * *." (b) Taxable Years To Which Applicable. - (1) General Rule. - Except as provided in paragraph (2), the amendments made by subsection (a) shall be applicable with respect to taxable years beginning after December 31, 1942, * * *. (2) Retroactive Effect. - The amendments made by subsection (a) shall also be applicable with respect to all taxable years to which such amendments are not made applicable under paragraph (1), in the same manner as if such amendments had been a part of the revenue laws applicable to such taxable years, but only if there are filed with the Commissioner (in accordance with regulations prescribed by him with the approval of the Secretary) at such time and by such persons as may be prescribed under such regulations, signed consents that there shall be paid, at such time as the Commissioner may prescribe, all of the taxes under Chapter 1 of the Internal Revenue Code or under the corresponding provisions of prior revenue laws which would have been paid for the taxable years concerned if such amendments had been a part of the revenue laws applicable to such taxable years. * * * * *↩
3. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealing in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *. George H. Whiteley, 2 T.C. 618↩ at page 622.
6. When a minor, for whose benefit a valid accumulation of the income of personal property has been directed, shall be destitute of other sufficient means of support or education, the supreme court, at special term in any case, or, if such accumulation shall have been directed by a will, the surrogate's court of the county in which such will shall have been admitted to probate, may, on the application of such minor or his guardian, cause a suitable sum to be taken from the moneys accumulated or directed to be accumulated, to be applied for the support or education of such minor.↩